THE CHICAGO AND AURORA RAILROAD COMPANY, Appellant, *v.* JAMES THOMPSON, Appellee.

### APPEAL FROM KANE.

Where a party examines a witness as to a conversation, the opposing party can only examine the witness upon the conversation about the same subject-matter; but not about a conversation upon a different subject, not related to the primary conversation.

Railroad companies are common carriers, although their charters do not, in so many words provide that they shall be.

Bank bills are not, in common parlance, included in the phrase, " goods and chattels," when used in connection with insurance companies and transportation by land or water.

Alleging and proving that a railroad company is a common carrier of " goods, freight, etc.," does not establish it to be a common carrier of bank bills.

Authority to receive goods and freight does not imply power to receive bank bills at the ordinary tariff for the risk.

If common carriers are to be held as insurers, they must be treated with good faith, and concealment, artifice, or suppression of truth, would equally relieve the insurer and common carrier from liability.

Common carriers are not liable for the loss of money packed among other goods in a box in such a way as to deceive and mislead them. If to be held liable, they should be told of the contents.

IN the first count of the declaration, the plaintiff alleges that on the 19th day of January, 1854, the defendant was, and now is, a common carrier of goods and chattels for hire, from Aurora in the county of Kane, to Earlville in the county of La Salle ; that on said day, at Aurora, the plaintiff caused to be delivered to defendant, and defendant received a certain box containing goods and chattels, to wit : One new suit of broadcloth clothes, one small trunk, three fine shirts, three pairs of woolen stockings, seven hundred and fifty dollars in bank bills, fifty dollars in silver money, and one rifle, of the said plaintiff, of the value of —— thousand dollars, to be carried from Aurora to Earlville, and at Earlville to be delivered for the said James Thompson, for certain reasonable reward in that behalf ; that defendant disregarded its promises and did not carry said box from Aurora to Earlville, nor there safely and securely deliver the same to the plaintiff ; that through the carelessness of the defendant said box was broken open, and its contents became and were wholly lost.

The second and only remaining count is essentially like the first, except that it alleges that defendant was to carry said box and contents from Aurora to Earlville, and there deliver the same to the plaintiff within a *reasonable time*, and that a reasonable time has elapsed, and the defendant has not safely and securely carried the said box and contents from Aurora to Earlville, nor there safely and securely delivered the same and its

contents to or for the plaintiff, and that the same are wholly lost to the plaintiff, to his damage $2,000.

The defendant filed a plea of the general issue.

The case was tried before the court, J. G. WILSON, Judge, without a jury, and at November term, 1856, the court rendered judgment for the plaintiff and against the defendant, for the sum of $730, besides costs of suit.

The defendant prayed an appeal to the Supreme Court.

The bill of exceptions shows, that on the trial, *Wm. B. Allen,* a witness for the plaintiff, testified in substance : That in January, 1854, he was in the warehouse business at Aurora ; that the defendant was a common carrier from Aurora to Earlville at that time ; that in the spring of 1854 plaintiff inquired at our warehouse about some goods marked *James Thompson, Paw Paw Grove ;* there were two boxes and one chest ; we received them from defendant, and afterwards shipped them to Earlville in good order ; that witness saw them put on board defendant's cars about 12th January, to go from Aurora to Earlville ; took no receipt for them ; they had been in our warehouse a few days.

On cross-examination, witness stated that : We received them about 7th January, consigned to us by Mitchell & Co. ; no one had them in charge ; they appeared to contain household goods, bedding, clothing, etc. ; I can generally tell by the looks of boxes ; we had no information of the contents from any one ; saw them put into the house, and afterwards into the car ; first time I saw plaintiff, was after I sent the goods ; that if any boards had been loose on the boxes, should have noticed it.

*James E. Woodbridge,* a witness for plaintiff, testified in substance : That in January or February, 1854, he was at Earlville with plaintiff, and found two boxes and one chest for plaintiff ; saw them in defendant's warehouse, marked Paw Paw Grove ; the largest box looked as if it had been opened ; it was then nailed up ; box was opened on sled by station house ; saw it till it was opened ; it contained one or two beds and bedding, a small table or stand, looking glass, bed clothes, pillows, tin-ware, two guns, knives, forks, dishes ; no valise or trunk. Box was made of pine boards, three or four feet square ; no iron hooping on the box ; that the boxes all appeared to contain household furniture, should suppose so from their appearance ; that rifle had been broken, and it would cost four or five dollars for new one ; an ordinary suit of clothes, fifteen or twenty dollars ; valise, two dollars fifty cents or three dollars ; shirt, one dollar ; socks, fifty cents ; cravat, one dollar.

The plaintiff next introduced the deposition of *Isaac P. Hallock,* who testified in substance : That he has known plaintiff about two years ; have known defendant since it existed ; that

he saw a large box on platform of station house at Earlville, belonging to plaintiff; said box had been opened, for a board was loose. One of the hands ordered it nailed up; box strongly nailed, except the loose board. This was about two years ago. R. C. Hume was station agent for defendant at Earlville; have been there when plaintiff and Hume were both there. Plaintiff said he had several hundred dollars in the box, and it was shipped in good order at Aurora; that it had been taken out on the way from Aurora to Earlville or at Earlville. Witness thinks he claimed about seven hundred dollars of defendant; said the money was in satchel, and that satchel was taken out. Hume said he knew nothing about it; that it was an improper place to carry money; that it was imprudent for him to state in a large crowd in Aurora that he had money in that box, as witness had understood; that he should pay him nothing; that he was a fool to put money in the box, and to report that he had money in the box, while the box was at Aurora.

Plaintiff next introduced the deposition of *Charles Labor*, who testified that he resides in Jenkins township, Luzerne county, Pa.; has known plaintiff twenty-five years in Patterson, Luzerne county; saw plaintiff at my house in December, 1853, at the time he was leaving for the West. I carried him and his baggage from my house to Scranton, where he took the cars; at Scranton unpacked his goods and money; plaintiff there got a box made of pine boards, about four and a half feet long and three and a half wide, and about three and a half high, posts in the corners, well made, and an iron hoop on top; saw plaintiff put his goods in the box; witness assisted to put them in; saw him put in one table, one looking glass, two feather beds and bed clothes, a lot of tin-ware, dishes, knives and forks, one rifle, with various other articles, and one valise was put into the box by me, between the beds, and box fastened up. James Thompson was written on the box, and directed to him at Paw Paw, Illinois, and box placed in care of railroad agent at Scranton. Saw said valise opened, and saw plaintiff take out a "comforter" for the neck, and a small roll of money, which plaintiff said was $100, and put it in his pocket; plaintiff showed me in the valise a large pile of bank bills, containing, I should say, from six hundred to eight hundred dollars; and in the valise saw also a full suit of clothes, of broadcloth, which had never been worn; said money remained in valise, and it was fastened up in valise in the box by plaintiff and myself; that to best of witness' knowledge and belief, plaintiff had, when he left Pennsylvania, from $950 to $1100, principally in bills; plaintiff received $600, beside some interest, from his father's estate; plaintiff received funds before he left, $100 from Zeba Bennett,

over $200 from E. S. Thompson & Brother, and over $200 for goods sold at auction, and also several other smaller sums of money ; that at time witness took plaintiff to Scranton, the railroad agent at that place objected to quality of boxes in which plaintiff's goods were packed, and told plaintiff if he would go to shop of the company and get good strong boxes made, and pack his goods in them, he would remain there ; the plaintiff went and procured the box mentioned to be made ; witness and plaintiff packed the goods in it, and the agent said it was good, sufficient, and received the box with the goods and money in it as above stated.

The plaintiff next read in evidence the deposition of *Andrew T. McClintock*, who testified that he resides in Wilksbarre, Luzerne county, Pa. ; has known plaintiff fifteen years ; on 27th August, 1853, I gave plaintiff a draft on Pennsylvania Coal Company, N. Y., for $190 ; and on the 7th of December, 1853, another draft on the same company for $500 ; knows nothing about plaintiff's means when he left Pennsylvania, except as above stated.

The plaintiff next read in evidence the deposition of *James Jones*, who testified that he is clerk in Wyoming Bank, Luzerne county, Pa. ; has known plaintiff fifteen years ; saw him last at Wyoming Bank in the latter part of 1853, a short time before he left for the West ; on 7th day of December, 1853, Andrew T. McClintock's draft on Pennsylvania Canal Company for $500 was paid at our bank ; plaintiff at same time drew from bank a large amount of gold ; the amount cannot state ; do not know whether we paid him in gold or bills on the draft above mentioned ; know nothing more about what money plaintiff had when about leaving for the West than I have stated.

Plaintiff then introduced the deposition of *Zeba Bennett*, who testified that he resides in Wilksbarre, Pa. ; has known plaintiff about forty years ; that he paid plaintiff $100 on 7th December, 1853.

And thereupon the defendant introduced as witness, *R. C. Hume*, who testified that he was, in 1854, and still is freight agent at Earlville ; never saw the boxes till they were delivered to plaintiff. They had been at Aurora a week or ten days ; came to Earlville on night before or on the morning they were delivered ; came on night train. The first I knew anything of them, was at 9 or 10 A. M. Warner had charge of station in my absence ; goods came Saturday night ; I went down Sunday night ; Monday morning plaintiff asked for the goods ; went to station house and found them ; he paid charges and took a receipt for the goods in good order ; after goods were loaded on sled, plaintiff came back and told me one of his boxes had been broken open ;

I looked at it on the sled; Hallack said a board was loose when it was taken out of the car; box was between half and two-thirds full; saw nothing wrong except board loose; plaintiff told me he had lost a valise with $900 in it; said nothing about losing any clothes; the first I heard of that, was here in court; that at time goods arrived, witness was at Aurora.

*Lester Harding*, a witness for defendant, testified that he lived at Paw Paw; knows plaintiff since 1853; plaintiff bought land of me; paid me $200 Dec. 31, 1853, $300 13th March, 1854, also at same time $105 for yoke of cattle.

The plaintiff then asked the witness, " What did he tell you when he paid you the $300 ?" To which question the defendant, by its counsel, objected. The court overruled the objection and allowed witness to answer, to which answer the defendant by its counsel at the time excepted.

Witness answered—the plaintiff said he had been back East after he paid the $200 and before he paid the $300.

The defendant then introduced the receipt of the plaintiff for said goods in good order, which it is admitted was signed before he had examined the box.

The plaintiff thereupon recalled witness Woodbridge, who further testified that plaintiff stated in Hume's presence that the valise contained $700 and a new suit of clothes never worn; this was some time in the afternoon.

J. W. WALKER and VAN ARMAN, for Appellant.

T. L. DICKEY, W. H. L. WALLACE and S. WILCOX, for Appellee.

BREESE, J. This was an action on the case, brought to the November term, 1854, of the Kane Circuit Court. The declaration contains two counts essentially alike. The first count alleges, that on the 19th of January, 1854, the defendant was, and now is, a common carrier of goods and chattels for hire, from Aurora, in the county of Kane, to Earlville, in the county of La Salle; that on that day, at Aurora, the plaintiff delivered to the defendant, and the defendant received, a certain box containing goods and chattels, to wit: one new suit of broadcloth clothes, one small trunk, three fine shirts, three pairs of woolen stockings, seven hundred and fifty dollars in bank bills, fifty dollars in silver money, and one rifle, of the value of one thousand dollars, the property of the plaintiff, to be carried from Aurora to Earlville, and at Earlville to be delivered for the said James Thompson, for certain reasonable reward in that behalf; that the defendant disregarded his promise, and did not carry the box from Aurora to Earlville, nor there safely and securely

deliver it for the plaintiff, and that through the carelessness of the defendant the box was broken open and its contents lost to the plaintiff.

The second count alleges that they agreed to deliver it in a reasonable time.

The general issue was pleaded and tried by the court by consent, and verdict and judgment for the plaintiff, and appeal prayed and allowed to the defendant. The evidence is all preserved in the record, and it is assigned here for error: permitting Lester Harding, a witness for the defendant, to answer this question, put to him by the plaintiff: " What did he (plaintiff) tell you when he paid you the three hundred dollars?" in deciding that the plaintiff was entitled to recover for the money contained in the box mentioned in the declaration; in deciding that the plaintiff was entitled to judgment therein, without alleging or proving that the defendant was a common carrier of money or bank bills; and in giving judgment for the plaintiff without such proof.

The appellee contends that the first error is not well assigned, for the reason that the appellant had called out a part of the conversation with Harding, and therefore the whole must come out. As a general principle this is true, but it must be confined to conversation as to the subject-matter about which his conversation had been called out, not a different subject, having no connection with it, or relation to it. But the record does not show that appellant had called out any conversation of appellee with Harding. Harding stated simply that he lived at Paw Paw Grove; knew the plaintiff since 1853; he bought land of me; paid me $200 Dec. 31, 1853, and $300 March 13, 1854, also at same time, $105 for a yoke of cattle. These were all acts done. The question then, " What did he, the plaintiff, tell you when he paid you the three hundred dollars?" was inadmissible. It put it in his power to strengthen his case very much by the reply he might make to it. Whether he did so or not, is not material—on principle the question was improper.

But this is a very small matter in this case, involving, as it does, one of the most important questions we have been called on to consider.

The declaration alleges that the defendant, when the box was delivered to him, was " a common carrier of goods and chattels for hire," and plaintiff's counsel contends that being such, he is liable for the value of the box and its contents.

The appellant denies that he is a common carrier, that the charter of the company does not make him so for any purpose, much less of bank bills, and there being no express contract, and the charter of the company not making the company a com-

Chicago and Aurora Railroad Company *v.* Thompson.

mon carrier of bank bills, whether it was such or not, was a fact to be alleged and proved.

We suppose it is not necessary the charter should provide, in so many words, that the railroad companies created by them shall be common carriers.

The authorities are numerous to the point that such companies, using cars for the purpose of carrying goods for all persons indifferently, for hire, and whose custom and uniform practice is to do so, are common carriers, and liable as such. There can be no doubt on this point. There needs no legislative declaration to make them such; they are so in virtue of their uniform business. As was well said by the court in *Thomas* v. *Boston and Providence Railroad Company*, 10 Metcalf R. 475, they advertise for freight, they make known the terms of carriage, they provide suitable vehicles, and select convenient places for receiving and delivering goods, and, as a legal consequence of such acts, they have become common carriers of merchandise, and are subject to the provisions of the common law, which are applicable to carriers.

Their character or vocation as common carriers of goods and freight, and passengers, is sufficiently shown by the testimony of Mr. Allen, who shipped the box from Aurora for Earlville. He says, in January, 1854, he was in the warehouse business at Aurora; knows that defendant has a railroad for carrying freight and passengers between Earlville and Aurora, and was then a common carrier of "goods, freight, etc., for hire."

Now, the question is, are these terms equivalent to the terms "goods and chattels," as used in the declaration, and do they reasonably include bank bills?

The term "goods and chattels" includes choses in action. 1 Atkins, 182. The term "chattels" is more comprehensive than the term "goods," and will include animate as well as inanimate property, slaves, horses, cattle, etc., being chattels, but "goods" will not be included as that term is understood.

Every moveable thing which can be weighed, measured or counted, is included under the general term "chattels," which, Lord Coke says, is a French word, signifying goods.

Blackstone says the term is, in truth, derived from the technical Latin word *catalla*, which primarily signified only beasts of husbandry, or, as we still call them, *cattle*, but, in its secondary sense, was applied to all moveables in general. 2 Com. 385.

We may remark here, that in the English statute of limitations (21 James I, chap. 5) this phraseology is used, as regards the action of replevin: "goods and *cattle*," and not, as in our modern statutes, "goods and chattels."

Chicago and Aurora Railroad Company v. Thompson.

Chattels personal are animals, household stuff, money, jewels, corn, garments, and everything else that can properly be put in motion, and transferred from place to place. 2 Blackstone's Com. 387.

Money is a chattel, and as chattel, according to Lord Coke, signifies goods, money is, therefore, goods, and not only that, but goods and chattels. Choses in action are goods and chattels ; bank bills are choses in action—therefore, bank bills are goods and chattels, and must be comprehended under the word " goods," as used in the phrase of the witness—" goods, freight, etc."

This being true as a general proposition, that the term " goods and chattels" would include bank bills under certain circumstances, does it follow that, at all times, for all purposes, and under all conditions, bank bills must be regarded as goods and chattels merely ? In practical life, among business men, in many commercial transactions, bank bills, though having no intrinsic value, are used as money, and perform the function of money for home purposes. The supposed representatives of real value—gold and silver—and convertible readily into gold and silver, they have thereby a value imparted to them by the consent of the community in which they circulate, which entitles them to more special regard and care than the ordinary goods and chattels which they can buy, and when bought, are boxed up and sent off, by the most ready conveyance, wheresover, and to whomsoever, ordered.

Bank bills are not, therefore, in common parlance, supposed to be included in the phrase " goods and chattels," and though they are such, to be taken on execution, to pass to executors or administrators, to assignees in bankruptcy, and in some cases, to devisees in a will, under the term goods ; yet, in connection with insurance policies, and transportation by land or water, they are not so regarded.

In 1 Arnold on Ins. 214, it is said, that it is not necessary, in most cases, for the merchant who wishes to insure his merchandise against sea risks, to do more than give a general description of it, as " goods," or " merchandise." And though doubt was entertained, at one time, whether money, bullion or jewelry were covered by the general denomination of " goods, wares and merchandise," it is now settled that they may be so insured, though, in actual practice, they are generally insured under a specific description. Ib. 216.

Under the term " goods and merchandise," specie dollars, the proceeds of the sale of the goods covered by the policy, were held to be included. *Am. Ins. Co.* v. *Griswold,* 14 Wend. R. 399.

38

In a time policy, effected by the owner of the vessel, who was also the captain or master, it was held, that the term "*property*," included current bank bills owned by the captain, and on board the vessel for the purpose of the coasting business, and that the underwriters were bound to pay for the loss of such bills by fire on board the vessel. *Whiton* v. *The Old Colony Ins. Co.*, 2 Metcalf R. 1. The court say that the term " property," is a term of the largest import, more extensive than " goods, wares and merchandise." The case shows distinctly the bank bills were not on freight, or received as freight for transportation; the inference is, that had the terms " goods, wares and merchandise " been used, bank bills would not have been embraced, clearly not then, if the word " goods " was alone used, a policy on " goods" meaning, only, such goods as are merchantable, that is to say, the cargo put on board for the purposes of trade—technically, *merces*. *Brown* v. *Stapyleton*, 4 Bingham R. 121; *Hill* v. *Patten*, 8 East R. 373.

In Manning's Index, 165, Justice DAMPIER is reported to have said, that the term " goods, wares and merchandise," will cover dollars, if entered at the custom house, but not bank notes or bills of exchange; they must be specifically described. This is the principle in insurance policies.

Now, as the term " goods " will not, as generally understood, include bank bills, neither will the word " freight," for, though carried, they are never received and taken as freight, in the popular sense of the term as part of a cargo or carload.

Technically, it is the reward the common carrier receives for the use of the means he provides for transportation, and for his care over them, and should be in some proportion to the risk run.

What the " &c." may be supposed to mean, will not be considered; it is too indefinite.

Alleging then, and proving, that the appellants'were common carriers of " goods, freight, &c.," does not establish that they were common carriers of bank bills.

It is true, they may make themselves such carriers, but there is no proof that they have done so. No portion of the proof goes to the point that they, at any time, carried bank bills, or money of any kind, or held themselves out to the public as carriers of such property. No express contract to carry these bank bills, has been proved, and none can be implied from the nature of their business, as carriers of " goods, freight, &c., and passengers."

It not being, then, the business of the company to take bank bills as freight, it should be proved that in this particular case, they authorized their agent to receive them, before the company

can be liable. Authority to receive goods and freight, does not imply this power to receive bank bills at the ordinary tariff for the risk.

It is no answer, to say he was authorized in the course of the business to receive the box as freight, and consequently, is responsible for all the box contained. This would be so, if the box contained nothing more than such articles, known in common parlance as goods and chattels, which the company was accustomed to carry for hire, their charges being proportioned to the value of the articles and the risk incurred.

If the bank bills, when out of the box, were not " goods," in the ordinary acceptation of that term, concealing them in a box would not make them so, nor would they thereby lose the distinctive character the whole community accords to them.

A case bearing on this has been cited on both sides, *Allen.* v. *Sewall*, 2 Wend. R. 327, in which it appears, by act of the General Assembly of New York, the members of a certain steamboat company were made individually liable, in the same manner as carriers at common law, for the transportation of all *goods, wares and merchandise* delivered to the agents of that corporation, and for all contracts made by such agents relating to the business of the corporation.

Allen put on board the steamboat " Sun," belonging to the company, a packet containing $14,347\frac{50}{100}$ in bank bills, and $1,800 in a draft on a bank at Albany, to be transported to Albany and delivered to a cashier of a bank there. The packet was delivered to the captain of the boat, and informed that it was very valuable, and who engaged to take charge of it and deliver it according to its direction.

The packet was not delivered to the person to whom it was directed.

It was a general practice to send money in steamboats. For carrying specie a fixed price was paid, which went to the company; the carriage of packets of bank bills was a perquisite of the captain.

The " Sun " was employed as a passenger boat, though she carried light freight. For the carriage of boxes a charge was made, but none for small bundles; and when freight was carried, an extra price was charged. Nothing was charged for the ordinary baggage of passengers. The company did not receive pay for packets carried by the captain, who was instructed not to carry money, though such instructions were never published.

It was agreed, as in this case, that bank bills were goods within the meaning of the act incorporating the company; that they were treated as money, and might be levied on as the goods and chattels of a defendant on an execution; that they represent

our circulating medium; that the packet was delivered to the captain as the agent of the defendant; that it was a proper article for freight or transportation in a steamboat; no mode of conveyance could be more safe and expeditious; that a person may be a common carrier of money as well as other property.

The defendant's counsel contended that bills, notes, drafts, etc., were not goods, wares and merchandise within the meaning of the statute.

The court said, in giving judgment for the plaintiff against Sewall, a member of the company, that the term "goods" is synonymous with personal chattels; that money has been accounted goods and chattels, though things in action are not generally so accounted. This court had considered bank bills money, and held that as such they might be levied on; persons can be common carriers of money, and they are responsible for its safe delivery; no ground for the imputation of fraud, in concealing the fact that money was sent, to exonerate the carrier, for that was disclosed.

This case was taken up to the court of Errors, and is reported in 6 Wend. R. 335, as *Sewall v. Allen*, and the judgment reversed, that court deciding that a company, incorporated for the transportation of goods, wares and merchandise, and liable as common carriers for such, are not common carriers of packages of bank bills, unless it be shown they have made the carriage of such packages a part of their ordinary business.

WALWORTH, Ch., was for affirming the decision, but he says, if the contents and value of a package is improperly or fraudulently concealed from a carrier, for the purpose of depriving him of a part of the compensation he would otherwise have claimed for the transportation and risk, he would not be liable if he uses the ordinary vigilance which a prudent man would exercise of his own property of the same *apparent* value.

Senators McLean, Oliver and Talmadge held, that the terms goods, wares and merchandise, as used in the act of incorporation, did not include bank bills; that though they are, under certain circumstances and for certain purposes, considered and treated as goods, under other circumstances they are not; they could not be given in evidence under a declaration for goods, wares and merchandise, or of demanding them on a promissory note made payable in goods, etc.; and if they do mean bank bills, yet the company were not obliged to carry them, for it does not follow they become common carriers of all things of which they might by their act of incorporation, or otherwise, have become common carriers. A common carrier may limit his business as he pleases, and their character as carriers of bank bills must be made out by proof, that they may

become such carriers, etc. So there were six senators with the Chancellor for affirming the judgment, and fifteen senators for reversal.

Justice STORY, in his comments on this case, *Citizens' Bank* v. *Nantucket S. Boat Co.*, 2 Story C. C. R. 49, says : " If I were compelled to choose between the relative authority of these decisions, upon the ground of the reasoning contained therein, I should certainly have deemed that of the court of Errors the best founded in the principles of the law."

In 2 Kent's Com. 609, there is in note *b*, a reference to this case, and the author finds no fault with the decision.

But admitting that it is fully established that the appellants were common carriers of bank bills for hire, they became, on receiving them, insurers against everything but inevitable accident, and the principles appertaining to the relation of insurer or underwriter, and insured, must apply. The company is the insurer, the owner or party freighting, the insured, and the premium is the price paid for transportation, or freight charges, bearing some proportion to the risk; their insurance being in respect of the reward they are to receive.

Now, to make a contract of insurance valid and binding, there must be good faith on the part of the insured.

As said by Lord MANSFIELD, in *Carter* v. *Bockon*, 3 Burrow, 1905, insurance is a contract upon speculation; the special facts upon which the contingent chance is to be computed, lie, most commonly, in the knowledge of the insured only. The underwriter trusts to his representation, and proceeds upon confidence that he does not keep back any circumstance in his knowledge, to mislead the underwriter into a belief that the circumstance does not exist, and to induce him to estimate the risk as if it did not exist. The keeping back such circumstance is a fraud, and therefore the policy is void. Although the suppression should happen through mistake, without any fraudulent intention, yet still the underwriter is *deceived*, and the policy is void; because the risk run is really different from the risk understood and intended to be run, at the time of the agreement. "

" The reason of the rule which obliges parties to disclose, is to prevent fraud, and to encourage good faith. It is adapted to such facts as vary the nature of the contract; which one privately *knows*, and the other is ignorant of and *has no reason to suspect*. "

So it seems that concealment, or the suppression of any fact or circumstance material to the risk, is fatal to the contract; without any special agreement, it is a species of fraud, a *suppressio veri* rendering the contract void *ab initio*. But it is not solely on the ground of fraud that concealment avoids the con-

tract; the omission to state material circumstances, though the omission be the result of accident or negligence, will avoid it.

Representation, as here used, is a material fact stated by either party to the other before completing the contract, and a misrepresentation is the statement of such a fact, which turns out not to be true. By a material fact, is meant one that shows the nature and extent of the risk, and may induce the other party to enter into the contract. A concealment, on the other hand, is the suppression of a material fact within the knowledge of either party, which the other has not the means of knowing, or is not presumed to know, (1 Philips on Ins. 214,) and it is equivalent to a false statement, and amounts to fraud. *Lockridge* v. *Foster et al.*, 4 Scam. R. 573.

Testing this case by these principles, these carriers cannot be held liable for the loss of the bank bills, for although there were no verbal representations of any kind made by the appellee, there was that which was equivalent to it, in the structure and appearance of the box in which it is said these bills were placed. That, according to the description given of it by the witnesses, told only the plain and simple tale, that tables, bed-clothes and bedding, and some other cheap articles, were in it, such as were usually carried in such boxes, for the usual freight charges. The fact most important for the insurers to know, that among this paltry stuff was a valise, with seven hundred and fifty dollars in bank bills in it, was not disclosed. The owner, treating the box as of no particular value—shipping it as common freight, concealing its true value, deludes and deceives the carrier; an imposition is practiced upon him to deprive him of the compensation he is entitled to, in proportion to the value of the article entrusted to his care, and the consequent risk he incurs, and it tends to lessen the vigilance he would otherwise bestow. 2 Kent's Com. 603; 3 W. & S., *Relf* v. *Rapp*, 25.

A case very similar to this is to be found in 4 Burrow's R. 2298, the case of *Gibbon* v. *Paynton,* and another. It was an action against the Birmingham stage-coachman for one hundred pounds in money, sent from Birmingham to London by his coach, and lost. It *was hid in hay in an old mail-bag*. The bag and hay arrived safe, but the money was gone. Notice was brought home to the plaintiff that the company had advertised in a public newspaper that the coachman would not be answerable for money or jewels, or other valuable goods, unless he had notice that it was money, etc., that was delivered to him to be carried.

It was proved that money was not carried from Birmingham to London at the common and ordinary prices of the carriage of other goods, and it likewise appeared, from a letter of the plaintiff, that he knew this, and that he was conscious he could not

recover by reason of the concealment. Verdict for defendant. It was argued — as it is in this case, by the appellee — on the motion for a new trial, that the coachman was answerable, though he did not know that it was money ; that a carrier is always answerable, unless he accepts the goods specially ; that he made no inquiry or objection, and is therefore answerable. It is incumbent upon him to see that he is not cheated. He is bound to receive the goods, and must run the risk, citing, among other cases, that of *Fitchburn* v. *White*, 1 Strange R. 145, in which, Lord Chief Justice KING held, " that if a box is delivered, generally, to a carrier, and he accepts it, he is answerable, though the party did not tell him there is money in it."

Lord MANSFIELD held, that a common carrier, in respect of the premium he is to receive, runs the risk of the goods, and must make good the loss, though it happen without any fault in him, the reward making him answerable for their safe delivery, and the reward ought to be proportionable to the risk. If he makes a greater warranty and insurance, he will take greater care, use more caution, and be at the expense of more guards, or other methods of security ; and therefore he ought, in reason and justice, to have a greater reward. Consequently, if the owner of the goods has been guilty of a fraud upon the carrier, such fraud ought to excuse the carrier. And here, the owner was guilty of a fraud upon him ; the proof of it is over-abundant. And if he has been guilty of a fraud, how can he recover ? *Ex dolo malo non oritur actio.*

Justice YATES said : By the general custom of the realm, a common carrier insures the goods at all events, and it is right and reasonable that he should do so ; but he may make a special contract, etc. And certainly, the party undertaking, ought to be apprized what it is that he undertakes, and then he will, or at least may, take proper care. But he ought not to be answerable when he is deceived. Here he was deceived. The money was hid in an old mail bag, and it was hid from him that it was money.

Mr. Justice ASTON, who tried the cause, said, " he never had any doubt about the justice of it. It manifestly appeared that this money was sent under a concealment of its being money. The true principle of a carrier's being answerable, is the reward. And a higher price ought, in conscience, to be paid him for the insurance of money, jewels, and valuable things, than for insuring common goods of small value. Mr. Justice WILLIS concurred.

The court here did not, as distinctly as we have attempted to do, judge this case upon the principles of insurance, but all their arguments lead to it. It is a very clear case, and very like the one before us, and not much stress is laid upon the fact

of notice. The whole bearing of the case is on the fraud and deceit.

We have looked into the case of *Fitchburn* v. *White*, 1 Strange R. 145, and find it as cited. A reference, in that case, is made to this case, of *Gibbon* v. *Paynton*, and to *Sir Joseph Tyley et al.* v. *Morrice*, Carthew R. 485, where it is held that the carrier was liable only for what " *he was fairly told of.*" See, also, *Great Northern Railway Company* v. *Shepherd*, 14 Eng. L. and Eq. 370 ; *Botson et al.* v. *Donovan et al.* 6 ib. 373.

In this case, as in Paynton's case, the owner of the money was guilty of a fraud upon the carrier, in concealing, in a rough box, stuffed with feather beds, bedding, tin ware, dishes, guns, etc., a very large sum of money. This artifice, giving the box a mean or common appearance, and thereby inducing the carrier to think it of no particular value, and so prevent him from making inquiries, ought to be regarded as pregnant proof of fraud. It is no answer to say, that the carrier made no inquiry about the box ; the artifice resorted to prevented it ; it was complete ; there was nothing about it to excite special attention to it. The owner gave out that the box was not more valuable than it appeared to be, by treating it with so little care as he did, provoking a corresponding care only, on the part of the carrier. It seems to have been a plan laid to get his money—if he really had any, which we must doubt—safely carried, and cheaply, without paying any premium for the risk.

We say, it is doubtful if the money, or bank bills, was really in the box, after it left Scranton, or even while there. The witness, Charles Labor, who speaks to that point is not at all positive. He says the goods were repacked at Scranton, on the suggestion of the railroad agent there; and a box made at the company's shop, the dimensions of which he gives. He saw the goods put into this box, and " one valise was put into the box, by himself, between the beds, and the box fastened up. James Thompson was written on the box, and directed to him at Pawpaw, Illinois, and box placed in the care of railroad agent at Scranton. Saw valise opened, and saw plaintiff take out a comforter for the neck, and a small roll of money, which plaintiff *said* was one hundred dollars, and put it in his pocket. Plaintiff showed him, in the valise, a large pile of bank bills, containing, *he should say*, from six to eight hundred dollars, which remained in the valise. It was fastened up in the valise in the box by plaintiff and himself. To the best *of his knowledge*, plaintiff had, when he left Pennsylvania, from $950 to $1,100, principally in bills. Plaintiff received $600, besides some interest from his father's estate ; received funds before he left : one hundred dollars from Zeba Bennet ; over two hundred from E. S. Thompson

& Brother, and over two hundred dollars for goods sold at auction, and also several other small sums."

This witness does not state how he knows these facts. It is manifestly all hearsay, derived from the plaintiff himself. The plaintiff told him how much money he had, graduating the amount to the appearance of the pile in the valise. As to that, to what does his testimony really amount? What is more deceptive than a pile of bank bills? and how could any one speak of the amount, unless he knew the denomination of each bill? He could not possibly tell whether there was one hundred dollars or one thousand dollars in the pile, for the smallest sum will make the largest pile, if in small bills, the other pile being composed of bills of a large denomination.

But, besides all, there is no proof whatever that these bills, if they were in the valise, were genuine bills, and of value. It is not an uncommon circumstance for spurious bills to be concealed in a valise, and, for aught that appears, all these bills may have been spurious—counterfeits. Nor does this witness state, that he remained with the plaintiff and the box until he started on the cars, and saw him and the box on board.

It was under the plaintiff's control at the station house at Scranton. He had free access to it there, and an opportunity to commit a fraud, if he designed one.

The plaintiff, however, does show, by competent evidence, that in December, 1853, he did receive, in Pennsylvania, seven hundred and ninety dollars, viz.: one hundred dollars from Zeba Bennet; from A. T. McCormick, five hundred dollars, in a draft, which was paid at the Wyoming bank, at which time Jones, a clerk in that bank, testified plaintiff drew out of that bank " a large amount in gold," the amount not stated. In August preceding, McCormick had given him another draft for one hundred and ninety dollars, which, it is quite likely, " was the large amount in gold" he drew out. All these sums make seven hundred and ninety dollars.

L. Harding testifies that on the 31st December, 1853, plaintiff paid him two hundred dollars on a land purchase, and, on the 13th March following, three hundred dollars, and, at the same time, one hundred and five dollars for a yoke of oxen; in all, six hundred and five dollars; to which is to be added the one hundred dollars in bills Labor says he took out of the valise, at the station, and put in his pocket. Here is seven hundred and five dollars, of the seven hundred and ninety, plausibly accounted for.

The six hundred dollars received from his father's estate, if received, which is not proved, was long before the receipt of these moneys in December, and the two hundred dollars for

goods sold at auction is not proved, so that the whole amount of money he is proved to have had, when he left Pennsylvania, was seven hundred and ninety dollars, for nearly all of which the testimony of Harding fully accounts.

But be all this as it may, we have attempted to show that bank bills do not, in common business affairs, come under the denomination of goods and chattels, or goods and freight, and therefore, the company is not chargeable for them, not having been received by them as such.

That if they were common carriers of bank bills, they were entitled to be informed that this box contained bank bills, so that they might have a corresponding premium for the risk incurred and care to be bestowed upon it. Suppressing or concealing this fact, in the manner and by the means resorted to by the plaintiff, was a fraud upon the defendant, and makes the contract void, for there can be no action where the plaintiff has practiced deceit and fraud.

Had this issue been tried by a jury, the court should have put the fraud, in the concealment of the contents of the box, home to them, and should have told them it was such an artifice to deceive, as to render the contract to carry void, and released the company from liability.

The judgment is reversed, the cause remanded, and a *venire facias de novo* awarded for further proceedings in conformity with this opinion.

*Judgment reversed.*